perpetuating a scheme to defraud the Federal and state governments, resulting in a decrease in quality of resident care.

3.176. **"ALL THE ACTIVITIES DIRECTORS", a pseudonym for Activity Directors and Directors of Social Services** providing services to Lake Worth Manor, all of the skilled nursing homes and/or nursing homes set forth above, ALLOFTHEM and THEREST; It is believed that their role and failure to report suspected incidents of Medicare Fraud, Medicaid Fraud, Resident Abuse and/or neglect assisted in perpetuating a scheme to defraud the Federal and state governments, resulting in a decrease in quality of resident care.

3.177. **"ALL THE BUSINESS MANAGERS", a pseudonym for business managers** providing services to Lake Worth Manor, all of the skilled nursing homes and/or nursing homes set forth above, ALLOFTHEM and THEREST; It is believed that their role and failure to report suspected incidents of Medicare Fraud, Medicaid Fraud, Resident Abuse and/or neglect assisted in perpetuating a scheme to defraud the Federal and state governments, resulting in a decrease in quality of resident care.

3.178. **"OTHERPHYSICIANS" as pseudonyms for physicians,** referring patients , while receiving compensation as a physician at  Lake Worth Manor, all of the skilled nursing homes and/or nursing homes set forth above, ALLOFTHEM and THEREST It is believed that their role and failure to report suspected incidents of Medicare Fraud, Medicaid Fraud, Resident Abuse and/or neglect assisted in perpetuating a scheme to defraud the Federal and state governments, resulting in a decrease in quality of resident care.

3.179. **"CONSULTANTS"** as pseudonyms for Nursing Consultants, Accounting Consultants, Social Services Consultants, Activities Consultants, Physical Therapy Consultants, Speech Therapy Consultants, Occupational Therapy Consultants , Food Service Consultants, providing services to Lake Worth Manor, all of the skilled nursing homes and/or nursing homes



set forth above, ALLOFTHEM and THEREST; It is believed that their role and failure to report

suspected incidents of Medicare Fraud, Medicaid Fraud, Resident Abuse and/or neglect assisted

in perpetuating a scheme to defraud the Federal and state governments, resulting in a decrease in

quality of resident care.

3.180.  **"OTHERPSYCHOLOGISTS AND PSYCHATRISTS" as pseudonyms for**

**physicians** treating patients while receiving compensation as at  Lake Worth Manor, all of the

skilled nursing homes and/or nursing homes set forth above, ALLOFTHEM and THEREST. It is

believed that their role and failure to report suspected incidents of Medicare Fraud, Medicaid

Fraud, Resident Abuse and/or neglect assisted in perpetuating a scheme to defraud the Federal

and state governments, resulting in a decrease in quality of resident care.


**IV.**

**Relators re-allege paragraphs 1.1-1.15; 2.1; 3.1-3.180 and allege further:**

**BACKGROUND COMMON TO ALL CLAIMS**

**(A)     THE SCHEME**

4.1      Throughout the past, approximate 10 years, Defendant Individuals[1] operating

through multiple Defendant Corporations[2] have worked in concert to deprive patients of quality

of care, and life; and to engage in numerous frauds, set forth in more detail below, unlawfully

obtaining licenses to own and/or operate and/or buy, lease, or sell nursing home facilities; for the

---

[1]  Primarily, but not limited to "Avi Klein", "Abraham Shaulson", "Eli Strohli", "Michael
Greenwald" "Ilan Najman", "Levi Rudd",  Leonard Grunstein,  Murray Foreman, Manuel and
David Sharf, and Otto Weingarten—most of whom operate under aliases—different spellings of
their names; aided and abetted by Attorney Michael Bernstein and Attorney Stanley Swindling)
[2] A representative sample are set forth in the caption; there are numerous other alter-ego
companies which act as "Landlord", "Tenant", "Owner", "Operator", "Lessor", "Lessee",
"Manager" of various Nursing Homes, all involved in the Scheme. Most of those alter-ego
companies are directly associated with the Actors.  Omnicare, a corporation under the law of
Kentucky, engages in similar schemes, in concert with the other named Defendants; and others.



purpose of defrauding the funders of services rendered to patients therein; said fraud resulting in payment for services not rendered, medications not administered, and re-setting up the reimbursement rates paid for the fraudulent services.  For the purpose of this Complaint, all of said activity shall be referred to as "the Scheme."

4.2     The scheme was, on the one hand as simple as the creation and use of one set of architectural plans and then reproducing it---over and over again, interchanging structural component ownership and/or spelling of names so that, on the other hand the Defendants ending up profiting from scores, if not hundreds of fraudulently obtained health care facilities dedicated to generating revenue for the Defendants while bilking government (Federal, State and sometimes, Counties) of money taken under false pretenses; and simultaneously depriving patients of rights guaranteed them by Federal and State laws. For the purpose of this Complaint, all of said Defendant individual persons and corporations shall be referred to as "the Actors."

4.3     The "victims" of the scheme were first, nursing home patients, oftentimes the most vulnerable in our society; and second, the governmental entities involved unwittingly in funding, thus facilitating the perpetuation and viral-like spread of the diseased NHF's throughout communities, cities, states and then from state to state typically with Avi Klein as the center of a new constellation of companies,  to the point where the Actors obtained millions, if not billions of dollars; and the patient-victims got sicker, many of whom died from neglect and deprivation of basic foods, medicines, care and medically necessary treatment -purposely inflicted upon them to allow the successful operation of the Scheme.  All the while the governmental entities were operating with tax proceeds obtained from their citizens; and thus the third victims of the scheme were the tax payers.  For the purpose of this Complaint, the Victims are referred to as either Patient Victims (hereinafter "PV"), or Governmental Victims (hereinafter "GV")



4.4     The common overarching plan to facilitate the Scheme involved the following subparts:

(a)     Obtaining ownership of a NHF through the use of fraudulent applications. The fraud in the applications involved primarily, not disclosing the inter-relationships of the Actors involved, in violation of 42 C.F.R. § 413.17 so that upon obtaining ownership (through purchase and/or lease) the Medicare and Medicaid reimbursement rates paid to the NHF were "re-set" to the highest allowed by then current law and regulation.

(b)     Utilizing budgets in the application which would have been necessary to provide the best, and necessary care to the patients; knowing that said budgets were false; that the new "owner" would not spend the monies allocated for nursing care, food, housekeeping, clothing, activities programs, appropriate medical/psychological treatment, therapy services, "life safety" renovations to protect daily safety of patients and staff and other medically necessary services.

(c)     Facilitating the presentation of false financial sufficiency by placing, oftentimes for only a few days, sufficient funds in the bank account of the "new owners" so that they "qualified" for ownership, and then withdrawing those funds immediately following approval of the applications;

(d)     Upon licensure thereafter intentionally withholding necessary food, prescriptions, nursing care and medically necessary medications; thus coming in "under budget;"



(e)     Simultaneous with "c" above, fraudulently claiming the provision of therapeutic services, such as physical therapy, occupational therapy, psychological and/or psychiatric services, thus increasing the payments to the NHF;

(f)     Simultaneous with "c" and "d" above drawing money from the NHF for over-priced, and in many cases non-existent "administrative overhead" and/or over-inflated payments to suppliers owned and/or operated by the Actors; and then, at year's end, retroactively changing the contracts for services and/or rental agreements and/or leases, to eliminate "profit" earned by the NHF.

(g)     As a result of the lack of profit, and reduced reimbursable spending, the Medicare/Medicaid reimbursement rate would be re-set, down; thus reducing the eventual re-sale price obtainable relative to that particular NHF.

(h)     The process would continue, causing a downward spiral in the fair market value of the NHF, and reducing reimbursement rates while increasingly and increasingly depriving the PV's of medically necessary care each year until the NHF was either "sold" or "leased" to an alleged "unrelated third party" which was constituted by the Actors and their cohorts; facilitated by the use of false names for the individuals and/or new "combinations" of the Actors through the establishment of a limited liability company and/or the "renaming" of the facility ("doing business as") whenever publicity and/or lawsuits exposed part of the Scheme; which then both allowed the Actors to declare a loss for tax purposes and their fellow Actors to obtain



the facility, thus re-setting (increasing) the Medicare/Medicaid reimbursement rate back to the highest level, at which time the evil downward spiral in care would commence again.

4.5     The Scheme was further enabled by the hiring of physicians as "medical directors" who didn't perform the tasks thereof, but rather served as referral sources to the NHF.

4.6     The Scheme was further enabled by the classification of non direct patient care providers as "Certified Nursing Assistants" but utilizing them as administrative or building service providers, thus simultaneous depriving patients of necessary care, increasing the work load of nurses to the point that they could not ethically fulfill their responsibilities and getting reimbursed by GV's for care staffing which was not provided.

4.7     The Scheme was further enabled by arrangements with providers of pharmaceuticals to not pay for medications when delivered, but rather arranging to pay discounted rates in the future substantially after the medications were delivered, all the while having the NHF's reimbursed by the GV's on a monthly basis for pharmaceuticals they hadn't paid for, and which they knew they would pay less for at a future date.

4.8     The Scheme was further enabled by establishing "medical supply companies" owned by the Actors and requiring the purchase of all materials from said medical supply companies at rates above fair market value.

4.9     The Scheme was further enabled by establishing ADELPO, a corporate wide system for staff to order goods and services at over-fair market prices; causing individual department (e.g., food, activities, medical, nursing, housekeeping, and administrative) budgets to become exceeded thus depriving patients of necessary supplies relative to their condition; and, if an item was not within the ADELPO system, causing many weeks delay in obtaining these necessary supplies while the PV's suffered.



4.10    The Scheme was further enabled by constructively discharging and/or firing "whistleblowers" within the nursing, and administrative staff positions upon false pretenses.

4.11    The Scheme was further enabled by the intentional use of "alter egos" e.g. false names, false identities, and confusing spelling of names for various purposes including contracting and applications for ownership of NHF's; *some examples* being:

    (a)    "Millenium Management," "Millennium Management L.L.C," Millennium Management L.L.C.;  Millenium Healthcare Management LLC, Millennium Administrative Services, LLC;  Millennium Seniorcare LLC, representing "alter egos" through interdependent ownership, addresses and agents.

    (b)    " Shaulson," "Shawson," and "Shavlson,"  being at least three of the  last name aliases of one of the principle Actors; interchanging with various first names including Auraham, Avraham, Avi, A and Abraham.

    (c)    "Strohli," "Slrohli," and "Strrohli," "Strolli," being at least three last name aliases of another of the principle Actors;

    (d)    Avi Klein, "Av Aklein", "AVKLEIN", and "A ANONYMOUS", representing at least three aliases of another of the principle Actors;

    (e)    Auraham Yisroel Shaulson; "Avraham Yisroel Shaulson," "Auraham Yisroel Shaulson," "Avi Y Shaulson,"  "Abraham Y Shaulson," "Avraham Y Shaulson," "Abraham Shavlson," "Abraha Shaulson," "Abrah Shaulson," "A Shaulson," "Abrgaham Shaul," "Avraham I. Shaulson," "Abraham Shaulson," "Abraham I Shaulson," "Abraham T Shaulson," "Abraha Shaulson," "Abraham I Shaulson," "Avraham Shaulson," "Avraham I Shaulson," "Abraham Shavlson," "Abraham Shavison,"



"Abraham Shavlson," " A. Shawson;" representing at least 20 aliases of one of the Principle Actors.

4.12    The Scheme also involved violation of other Federal and State laws, including, but not limited to **15 U.S.C. § 45** which explicitly makes unlawful unfair methods of competition; **15 U.S.C. § 52** which makes unlawful the conduct of dissemination of false advertising; **Florida's Deceptive and Unfair Trade Practice Act ("FDUTPA")** as described in § 501.201-501.213: Specifically the practices described in §501.204 and §501.2077; **the "Wire Fraud" statute** as set forth in 18 U.S.C. 1343; the **"Mail Fraud" statute** as set forth in 18 U.S.C. 1341; the **"Heath Care Fraud"** statute as set forth in 18 U.S.C. 1347; the **Omnibus Budget Reconciliation Act of 1987/ Federal Nursing Home Reform Act,** 42 U.S.C. §§ 1396r, 1396a(w) as incorporated by 42 U.S.C. § 1396r; the **Civil Rights Act**, 42 U.S.C. § 1983. et.seq.; and have committed Common Law Fraud.

**(B)     THE STATUTORY FUNDING BASISES**

4.13    Many individuals' premiums are paid under state buy-in agreements—voluntary arrangements between states and HCFA to purchase Medicare Part A & Part B coverage for certain Medicaid eligible individuals.  Generally, such persons will not have to pay a Medicare deductible and copayments.

4.14    The Medicare Catastrophic coverage Act required buy-in arrangements for additional groups of the poor, called qualified Medicare beneficiaries (QMB). A QMB is entitled to payment of Medicare Part A and Part B coinsurance and deductibles and Part B premiums if certain income and resource requirements are met.  State Medicaid plans also are required to provide payment for Part B Medicare premiums, known as cost-sharing, for: Specified Low Income Medicare Beneficiaries (SLMBs); and, Qualified Disabled and Working Individuals (QDWIs).



4.15   The Balanced Budget Act of 1997 added two more eligibility groups of cost-sharing qualified individuals (QIs)

> (a)   Individuals who would be QMBs but for income between 120% and 135% of the poverty line, who are not otherwise eligible. States must pay the entire Part B premium for these individuals.
>
> (b)   Individuals who would be QMBs except for income between 135% and 175% of the poverty line, who are not otherwise eligible. States must cover part of the cost of Part B premium for these individuals.

4.16   The Medicare program is administered by the Centers for Medicare and Medicaid Services ("CMS"), previously known as the Health Care Financing Administration ("HCFA"). CMS is under the Secretary of Health and Human Services, which is an agency of the Department of Health and Human Services.

4.17   To determine if an individual is entitled to benefits, the CMS contracts with private insurers to process claims, maintain beneficiary records, and investigate fraud, abuse, and recovery activities. Private contractors are known as "fiscal intermediaries" if dealing with Part A, and "carriers" if dealing with Part B.

4.18   In order to acquire Medicare funds the defendants engaged in fraudulent activity by submitting claims which it/he/she knew were false to the Health Care Financing Administration ("HCFA*") and/or to* Centers for Medicare and Medicaid Services ("CMS") . *Specifically* defendant, through its agents, Defendants named above, submitted claims which it knew to be false throughout 2008 and 2009.

4.19   In order to acquire Medicare funds the defendant engaged in fraudulent activity by submitting statements in support of claims which it knew were false to the Health Care Financing Administration ("HCFA*") and/or to* Centers for Medicare and Medicaid Services



("CMS"). Specifically defendant through its agent Defendants named above submitted statements which it knew to be false throughout 2008 and 2009.

**(C)     STATUTORY BASIS FOR PATIENTS' RIGHTS WHICH WERE VIOLATED**

4.20     Patients receiving Medicare, Medicaid, and who are residents of Nursing Homes are entitled to a set of rights guaranteed by Congress and which is binding upon all States who accept Medicare and Medicaid payments from the federal government.

4.21     Florida, and the at least twelve other states in which Defendant Millennium Management L.L.C. and Defendant Horizon Staffing, Inc. does business are recipients of federal funds through Medicare and Medicaid.

4.22     Defendants Lake Worth Manor, and Millennium Management L.L.C, L.L.C., as well as its employees and agents, has a duty to ensure that all persons providing care within the facility are competent to provide that care.   This duty includes not violating the federally protected legal rights of any resident through compliance with the Omnibus Budget Reconciliation Act of 1987/ Federal Nursing Home Reform Act, 42 U.S.C. §§ 1396r, 1396a(w) as incorporated by 42 U.S.C. § 1396r, and the implementing regulations found at 42 C.F.R. § 483, *et seq.*  These statutes and regulations are designed and intended to protect the interests and rights of persons such as Plaintiff Seaman and other Plaintiffs who will be directly joining as individual Plaintiffs, as well as all putative class action plaintiffs, who are/were residing in nursing facilities such as Lake Worth Manor., owned and/or operated by Millennium Management L.L.C, L.L.C.,  and/or staffed by Defendant Horizon Staffing, Inc.,

4.23     Defendant Lake Worth Manor, and other facilities owned and/or operated by Defendant Millennium Management L.L.C, Inc. operated as a "long term care nursing facility",



is/are a "licensed professional"); operated as a "skilled nursing facility" as defined by 42 U.S.C. §1395i-3 and is/are a "nursing facility" as defined by 42 U.S.C. §1396r(a).

4.24   The rights guaranteed by the Federal Nursing Home Reform Act, 42 U.S.C. § 1396r, *et seq.* which are relevant to the fraud by defendants and damages suffered by Plaintiffs include, but are not limited to:

(a)   A nursing facility must provide services and activities to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident in accordance with a written plan of care which—

(1)   describes the medical, nursing, and psychosocial needs of the resident and how such needs will be met;

(2)   is initially prepared, with the participation to the extent practicable of the resident or the resident's family or legal representative, by a team which includes the resident's attending physician and a registered professional nurse with responsibility for the resident; and

(3)   is periodically reviewed and revised by such team after each assessment under paragraph (3).

(b)   Residents' assessment

(1)   Requirement:  A nursing facility must conduct a comprehensive, accurate, standardized, reproducible assessment of each resident's functional capacity, which assessment.

(i)   describes the resident's capability to perform daily life functions and significant impairments in functional capacity;



        (ii)      is based on a uniform minimum data set …; …and

        (iv)     includes the identification of medical problems.

(c)     The provisions of section 1320a-7a of this title (other than subsections (a) and (b)) shall apply to a civil money penalty under this clause in the same manner as such provisions apply to a penalty or proceeding under section 1320a-7a(a) of this title.

(e)

        (1)     The facility shall not admit a patient who is mentally ill (as defined in subsection (e)(7)(G)(i) of this section) unless the State mental health authority has determined (based on an independent physical and mental evaluation performed by a person or entity other than the State mental health authority) prior to admission that, because of the physical and mental condition of the individual, the individual requires the level of services provided by a nursing facility, and, if the individual requires such level of services, whether the individual requires specialized services for mental illness, or

        (2)     is mentally retarded (as defined in subsection (e)(7)(G)(ii) of this section) unless the State mental retardation or developmental disability authority has determined prior to admission that, because of the physical and mental condition of the individual, the individual requires the level of services provided by a nursing facility, and, if the individual requires such level of services, whether the individual requires specialized services for mental



retardation.

(f)     Provision of services and activities

(1)     In general, to the extent needed to fulfill all plans of care, a nursing

facility must provide (or arrange for the provision of)—

(i)     nursing and related services and specialized rehabilitative

services to attain or maintain the highest practicable

physical, mental, and psychosocial well-being of each

resident;

(ii)    medically-related social services to attain or maintain the

highest practicable physical, mental, and psychosocial well-

being of each resident;

(iii)   pharmaceutical services (including procedures that assure

the accurate acquiring, receiving, dispensing, and

administering of all drugs and biological) to meet    the

needs of each resident;

(iv)    dietary services that assure that the meals meet the daily

nutritional and special dietary needs of each resident;

(v)     an on-going program, directed by a qualified professional,

of activities designed to meet the interests and the physical,

mental, and psychosocial well-being of each resident; and

(vi)    treatment and services required by mentally ill and

mentally retarded residents not otherwise provided or

arranged for (or required to be provided or arranged for) by

the State.



(vii)   The services provided or arranged by the facility must meet professional standards of quality.

(f)   Qualified persons providing services:  Services described above, must be provided by qualified persons in accordance with each resident's written plan of care.

(g)   Each patient has the right:

(1)   to be free from physical or mental abuse, corporal punishment, involuntary seclusion, and any physical or chemical restraints imposed for purposes of discipline or convenience and not required to treat the resident's medical symptoms.

(2)   to reside and receive services with reasonable accommodation of individual needs and preferences, except where the health or safety of the individual or other residents would be endangered, and

(3)   the right to voice grievances with respect to treatment or care that is (or fails to be) furnished, without discrimination or reprisal for voicing the grievances and the right to prompt efforts by the facility to resolve grievances the resident may have, including those with respect to the behavior of other residents.

(h)   The facility must, with regard to:  Protection of resident funds

(1)   may not require residents to deposit their personal funds with the facility, and

(2)   upon the written authorization of the resident, must hold, safeguard, and account for such personal funds under a system established and maintained by the facility.



(i)    If the facility has the written authorization of the resident to safeguard their personal funds:

    (1)    the facility must manage and account for the personal funds of the resident deposited with the facility; as follows:

        (i)    The facility must deposit any amount of personal funds in excess of $50 with respect to a resident in an interest bearing account (or accounts) that is separate from any of the facility's operating accounts and credits all interest earned on such separate account to such account. With respect to any other personal funds, the facility must maintain such funds in a non-interest bearing account or petty cash fund.

        (ii)    The facility must assure a full and complete separate accounting of each such resident's personal funds, maintain a written record of all financial transactions involving the personal funds of a resident deposited with the facility, and afford the resident (or a legal representative of the resident) reasonable access to such record.

        (iii)    Upon the death of a resident with such an account, the facility must convey promptly the resident's personal funds (and a final accounting of such funds) to the individual administering the resident's estate.

        (iv)    The facility may not impose a charge against the personal funds of a resident for any item or service for which



payment is made under this subchapter or subchapter XVIII of this chapter.

(j)    A nursing facility must be administered in a manner that enables it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident (consistent with requirements established).

**(D)    REPRESENTATIVE PATIENT VICTIMS**

4.25    Patient Victims are set forth below, and placed for illustrative purposes within four categories of suffering induced by Defendant's fraud (1) People who developed another disease and were kept until they were so ill and/or experienced traumatic events to necessitate a new hospitalization, which then changed the patient status/payer source from Medicare or Medicaid ; (2) People that were kept at the facility, being funded by Medicare/Medicaid services, but not getting treated; (3) People kept at the facility receiving Medicaid or Medicare benefits when they should have been transferred either to their home, or hospice; and ( 4.) People who should not have been accepted or allowed to reside in  Medicaid/ Medicare funded facility, because of their overall diagnosis, behavior, or symptoms required a higher level of care , presenting a risk to the patient, other patients, staff, and visitors.

4.26    Examples of Patients within each category are set forth below.

a.    **Gloria Kurzman**: Age 83, was sent to LAKE WORTH MANOR on/about October 10, 2008, after being seen in the ER Department of Bethesda Hospital, in Boynton Beach,  FL, by an emergency room physician doctor who then contacted Dr. Adel  Mansur, after  a slip and fall accident in her home.



1.     At the time of her injury, she was insured by HUMANA, and during her stay at Lake Worth Manor, she discontinued HUMANA and enrolled directly in Medicare.

2.     LAKE WORTH MANOR was an inappropriate referral insofar as the distance from her home and the overall patient population as a vast majority of their patients were suffering various psychiatric illnesses.

3.     Upon information and belief, Dr. Mansur had a previous relationship with the regional marketing director for Millennium Management, Beth Trepeck who is the current Marketing director for "Lakeview Care Center", and she was sent to LAKE WORTH MANOR to increase their census.

4.     Her primary injury was wounds suffered in the fall.  During her stay at LAKE WORTH MANOR her wounds were attended by an alleged "wound care nurse," who, upon information and belief, was employed by Horizon, who was not properly certified, and LAKE WORTH MANOR knew, and the State of Florida later learned, and cited LAKE WORTH MANOR, for utilizing a non-certified wound care nurse.

5.     During her stay at LAKE WORTH MANOR Gloria Kurzman developed decubeubitus ulcers on the back of both heels, which remained untreated. At the time of her discharge from LAKE WORTH MANOR, the ulcers had become a permanent



disfigurement which caused and continues to cause pain and suffering.

6.   The Head Nurse, Ermintude Mercy, a resident of West Palm Beach, at the time of Gloria Kurzman's stay at LAKE WORTH MANOR, was charged approximately 9 months ago with the illegal operation of an unlicensed assisted living facility by the State of Florida.

7.   Gloria Kurzman is a category 1 and 2.

b.   **Doreen Seaman** is a women age 42 who suffers from COPD, which causes her to need additional breathing assistance, Supra Nuclear Palsy which makes it difficult for her to see, a communication deficit, has a feeding tube (PEG) and has difficulty walking.   **Ms. Seaman** was sent to Lake Worth Manor from Memorial Hospital via the ECIN (electronic referral system used by many hospitals).   Her specific needs were set forth therein.   She was sent to Defendant, Lake Worth Manor, based upon the fraudulent representations made relating to the care she would receive.

1.   When Ms. Seaman arrived at Defendant, Lake Worth Manor, in approximately February, 2009, she had a medically necessary breathing assistance device, "The Breather", but it was stolen or lost at Defendant, Lake Worth Manor.   Defendants advised Ms. Seaman and Plaintiff, **Sofia Kostides**, Ms. Seaman's Health Care Surrogate, Defendant, Lake Worth Manor, would obtain the necessary breathing device, immediately.   The statement was known to be false when made and made with the intent not to



obtain the device, for the purpose of inducing Ms. **Seaman** into

remaining and returning to Defendant, Lake Worth Manor,  it was

reasonable for her and her health care surrogate to rely upon it, and

they did in fact rely on it causing them harm.  Defendant, Lake

Worth Manor, had no intention of obtaining the device and refused

to obtain the device for more than 7 months ignoring numerous

requests made by both Lake Worth Manor Staff and Ms. **Kostides**,

knowing that Ms. **Seaman** needed the device and that the

fraudulent commitment to obtain the device induced her to remain

at Lake Worth Manor and return to Lake Worth Manor following

the development of pneumonia and an ICU hospitalization in July

2009.  Ms. **Kostides** spoke with Defendant, Lake Worth Manor's

Admission Director, Defendant, Reejetta Miller, who stated

Defendant, Lake Worth Manor, would "honor commitments" made

to both Ms. **Kostides** and Ms. **Seaman**.

2.     In addition, Defendant, Lake Worth Manor, markets itself as a

facility which "developed patient specific care plans—

individualized to meet the needs of each patient that follows the

highest standards of medical practice".  This statement, contained

in Exhibit "B" was false statement of fact that known by the

Defendants to be false when made, was made for the purpose of

inducing Ms. **Seaman** into remaining and returning to  Defendant,

Lake Worth Manor,  it was reasonable for her and her health care

surrogate to rely upon it; and the false statement caused Ms.

**Seaman** harm.  The care received by Ms. Seaman was far below the standard of care as there was no "Respiratory Therapist" providing regular care.  In addition, the "Speech Therapist", Alma Medina, failed conduct base-line swallow tests or work with her to develop alternative communications mechanisms such as the use of a Dynabox computer, "thumbs up/down", spelling out words with a telephone, or writing on the back of a person's hand.  Further, Ms. Medina, an employee of Horizon Staffing working at Lake Worth Manor for over 8 years, was not instructed by Defendant Anderson to, nor did she provide in-services to Lake Worth Manor staff regarding different mechanisms for communicating with Ms. **Seaman**.

3.      Ms. Seaman, through her health care surrogate, Sophia Kostedes, requested Defendants provide a "VitalStim" an electronic device used to strengthen her throat muscles, which had been used previously and found beneficial to her; and  which would have made breathing and verbal communication easier.  Defendant, Lake Worth Manor promised to obtain that device without any intention of obtaining the device.  Defendants knew the statement was false when made, related to a material fact, was made for the purpose of inducing Ms. **Seaman** into remaining and returning to Defendant, Lake Worth Manor,  it was reasonable for her and her health care surrogate to rely upon it; and the false statement caused Ms. **Seaman** harm. Defendant, Lake Worth Manor, never obtained



for use with Ms. **Seaman** the "VitalStim" device she needed to overcome some of her disabilities. As a result of Ms. **Seaman**'s reasonable reliance upon the promises of Lake Worth Manor she suffered, and continues to suffer additional disability.

4. Following discharge from Physical Therapy, Restorative Nursing Care Nurse, Shamika Tate-Stubbs was responsible for assigning Restorative Nursing CNA Millie LNU to provide daily exercises, and walks to assure maintenance of range of motion and ambulation. This service has not been provided.

5. Independent advocates for vulnerable adults also observed that Ms. Seaman was not receiving necessary psychological/psychiatric treatment; and that the "charting" of Ms. Seaman's abilities were grossly erroneous.

6. Ms. Seaman was fortunate insofar as she eventually was released from LAKE WORTH MANOR back to Ms. Kostides' home, with the assistance of Broward County Agencies.

7. While a patient at Lake Worth Manor Doreen Seaman complained of abuse by patients and staff members. Lake Worth Manor failed to protect her from harm by failing to properly investigate complaints of abuse.

8. Doreen Seaman is in Category (1-3)

c. **Lillian Reilly:** Lillian Reilly is a white female, who was widowed. She was born March 21, 1919 and died April 5, 2009 at the age of 90. Her cause of death was cardiac arrest, C.A.D., and respiratory failure. Ms.



Reilly was born in Ireland and educated in England. She volunteered at St. Mary's Hospital and other organizations. Her daughter, Eileen Carsten, is the Durable Power of Attorney in agreement signed February 6, 2008 and the personal representative for her estate. Ms. Reilly's family was very involved in her care. She received frequent visits from local family members on a weekly basis. Eileen Carsten drove from the Daytona area to visit her mother one to two times per month. Ms. Carsten made a daily phone call to the facility to speak with her mom and also get a status check from the nursing staff. Ms. Reilly was admitted to Lake Worth Manor on October 15, 2007. Her original admitting physician was Dr. Lagrange. Ms. Reilly was a resident of Lake Worth Manor until mid-December of 2008, when her family discharged her from Lake Worth Manor to Avante of Ormond Beach, FL following a horrific fall on November 12, 2008. However, the distance was too far for many of her family members living in the area around Lake Worth Manor to travel to visit, so at the request of Ms. Reilly, she was transferred back to Lake Worth Manor for readmission on January 08, 2009. Upon readmission, her medical conditions were stable and she did not have any newly-developed diagnosis. Ms. Reilly's overall medical conditions include: unspecified anemia, chronic obstructive pulmonary disease (COPD), Nec., unspecified essential hypertension, unspecified hypothyroidism, anxiety state, other hyperlipidemia, gastric ulcer unspecified (no hemorper/obstruction), depressive disorder nec., esophageal reflux, muscle weakness (generalized), allergy unspecified nec. Prior to a hospitalization at JFK in



Atlantis, FL on April 03, 2009, Lillian Reilly was removed from Lake Worth Manor via stretcher after she was found unconscious. Director of Nursing Milord Isaac & Marla Todd, L.P.N., were in the LR room, while nurses Serenity Rodney and Jennifer Johnson revived her using CPR, until the E.M.S. arrived. Ms. Reilly was a patient at JFK for approximately 2-3 days until the time of her death on April 5, 2009. During her time at Lake Worth Manor, she was alert and oriented times three, self ambulatory in her wheelchair, often propelling herself to the destination of choice including activities, or the facility soda machines. It is our understanding that Ms. Reilly was able to walk unassisted prior to her entry into Lake Worth Manor. Ms. Reilly was an active participant in various activities programs. She enjoyed playing bingo, attended morning coffee and news, and entertainment and weekly religious services. She also participated in facility outings, as well as Lake Worth Manor resident council. She was a polite, nice woman, engaging in conversation, and got along well with her peers and roommates at Lake Worth Manor.

1.     **Ms. Reilly** arrived at Defendant, Lake Worth Manor, as a Humana patient, but she was dis-enrolled, without permission, from Humana and placed on Medicaid & Medicare Part A, by Lake Worth Manor Medicaid Specialist Ken Houston, who has been observed misrepresenting himself as a "social worker" at Lake Worth Manor, over the protests of Ms. **Reilly** and her daughter, Eileen Carsten, now Personal Representative for her estate. The statement was known by the Defendants to be false when made,

related to a material fact, made for the purpose of keeping Ms. **Reilly** at Defendant, Lake Worth Manor, it was reasonable for Humana and Medicaid to rely upon it; and the false statement caused Ms. **Reilly** harm.

2.   After the fraudulent disenrollment, Defendant, Lake Worth Manor, billed Ms. **Reilly** directly for services in the amount of $3,660.00 due to a lapse in coverage following the Humana disenrollment. These services had previously been covered under Medicare Part A.

3.   In addition, Defendant, Lake Worth Manor, billed for therapies which were not received by Ms. **Reilly**; and failed to provide a safe environment for her because she was supplied with a broken wheelchair.  She made numerous requests for a functional wheelchair of the nursing staff and the Physical Therapy Department (having a locking mechanism so she could brake) which were denied.  Eventually she was injured when the non-stoppable wheelchair caused her to be flung out of the wheelchair, hitting her head on the floor.  Her cognitive functions began to significantly decrease following the fall.

4.   Lillian Reilly is listed as a Category 1 and 2.

d.   **J.L.:** A male approximately 50 years old when at Defendant, Lake Worth Manor, now deceased, was induced into entering and staying at Defendant, Lake Worth Manor, based upon a statement by the Nursing Home Administrator at Defendant, Lake Worth Manor, that he was a

candidate for a prosthetic leg, and a statement by the Director of Rehabilitative Services, Leo Raymond that Defendant, Lake Worth Manor, would do everything possible to obtain the prosthetic leg. That statement was known by the Defendants to be false when made, was made without the intention to provide the prosthetic leg, related to a material fact, was made for the purpose of inducing J.L. into remaining at Defendant, Lake Worth Manor,  it was reasonable for him to rely upon it; and the false statement caused  J.L  harm.   Almost one year passed with no prosthetic leg being provided.  Then, after complaining of chest pains for more than one week, he was finally sent by Defendant, Lake Worth Manor, to JFK Hospital where he died.

1.      J.L. is an example of a Category 1& 2, patient.  He is Category 1, because he developed another disease and  was kept until they were so ill that a new hospitalization was required, which then restarted Medicare /Medicaid payments

   i.      J.L. medical condition grew worse while a patient at Lake Worth Manor as evidenced by cardiac condition: including Shortness of Breath and Chest Pain that was not developed prior to admission to LAKE WORTH MANOR.

   ii.      J.L. developed dental problems while a resident at LAKE WORTH MANOR. JSL had delays in obtaining dental treatment of his symptoms of pain and abscess of his bucal cavity.

2. He is a Category 2, who was kept at the facility, being funded by Medicare /Medicaid services, but not getting treated.

   i. <u>J.L.</u>did not receive adequate rehabilitative services while a patient at Lake Worth Manor.

   ii. J.L.did not receive "promised" prosthetic leg. initial admission care plan conference held in March of 2009.

e. **M.W.** is a black male, CURRENTLY 50 years old. His date of birth is May 23, 1960. As of November 4, 2009 following an arrest for an outstanding warrant (FTA for a non-jury trial for operating a motorized vehicle with a suspended license), his last known address was Lake Worth Manor.

1. M.W. arrived at Lake Worth Manor as a patient from another nursing home, in Lake Worth, FL, sometime between December 2008 and March 2009 as a Medicaid patient. M.W. was the victim of a shooting that led him paralyzed from the waist down. He uses an electric wheelchair/scooter as a primary mode of transportation. Lake Worth Manor administrator, Gilda Anderson, once requested that M.W. sign a document allowing Lake Worth Manor to withdraw money from his Lake Worth Manor resident trust fund in order to pay for a replacement battery or battery charger for the electric wheelchair/scooter.

2. M.W. had various medical issues, including pain; however the main issue upon admission to Lake Worth Manor was the treatment of unresolved pressure ulcer. Upon resolution of the



pressure ulcer, M.W. was promised to be transferred to an assisted living facility.

3.      M.W. was known to be a difficult patient, abusive to staff, non-compliant with facility policies, especially regarding room cleanliness, and often refused to allow housekeeping staff to enter his room to clean. Lake Worth Manor nursing staff was required to enter his room in pairs to prevent conflicting allegations or for protection.

4.      Upon the resolution of the pressure ulcer in April or May of 2009, the Director of Nursing, Joan Stover, suggested that M.W. be transferred to an assisted living facility as soon as possible. M.W. also made numerous requests to be transferred. Lake Worth Manor continued to delay his transfer, stating that "no place was available" or "Medicaid did not give him enough money monthly to secure a place."

5.      M.W. is listed as a Category 3. Upon further evaluation, he is also a Category 2 patient as well.

6.      M.W. was kept at the facility when he should have been transferred either to their home, or hospice: M.W. was promised, upon admission, placement in an assisted living facility (ALF) once his pressure ulcer healed. Lake Worth Manor delayed placement into ALF past the resolution of the pressure ulcer possibly to protect their daily census and to continue to receive Medicaid reimbursements.

7.    Category Two People that were kept at the facility, being funded by Medicare/Medicaid services, but not getting treated. Nursing staff at Lake Worth Manor regularly failed to enter his room while he was sleeping to change his urine bag, resulting in the bag becoming filled up causing infection.

8.    There were medication errors by nursing staff that put M.W. at risk for medication overdose.   One night he was given five Percocet pills, instead of five methadone pills, by a nurse. There were instances of various nursing staff and CNA's abusing him.

9.    Some of M.W.'s other complaints include:

   i.      Receiving funds at Lake Worth Manor, and being requested by Lake Worth Manor to sign his monthly Social Security/Disability check over Lake Worth Manor;

   ii.     Treatment of other patients including former Lake Worth Manor resident, S.R., who is deceased. He was very upset about the neglect and failure to treat M.W. on the day of his death that he remarked to Lake Worth Manor Social Worker Hope Garling that "I can't believe that Lake Worth Manor just let that man die; I called for help and they did nothing."

10.   M.W. has had a difficult family life.  He has a wife (may be divorced or estranged), a daughter, and a son, all believed to be living in the Belle Glade area. M.W. also has a history with the Florida Department of Children & Family including allegations of



child abuse made by both him and his estranged wife against each other.  M.W. also witnessed a crime and was serving as a witness at a criminal trial, which he was hoping that he would receive assistance with relocation through the Palm Beach County Witness Protection Program, following the conclusion of the trial expected to end in 2010.

f.      S.F. was a white female, who was approximately 34 years old.  She passed away on February 8, 2009 at Lake Worth Manor and it was initially determined to be an unexplained death.

    1.      Prior to becoming a patient at Lake Worth Manor, S.F. lived at Flamingo Cluster in Lake Worth, FL in a group medical home where Dr. Foreman served as a medical doctor.  S.F. was sent to Lake Worth Manor from JFK Medical Center as a Medicare Part A or Medicaid patient for what was supposed to be a two-week IV antibiotic treatment.  However, Lake Worth Manor kept her longer (approximately 1 to 1 ½ months) up until the day of her death.

    2.      Some of S.F.'s medical conditions included Peg feeding tube, difficulty breathing, severe mental handicaps since birth, and other medical conditions not known at the present time.  She was unresponsive to name, tactile touch and most stimulation, rarely opened her eyes, and spent most of her time in bed.

    3.      S.F. is listed as a Category 2.  Upon further evaluation, she is also a Category 3 patient as well.

4. Category Two People that were kept at the facility, being funded by Medicare/Medicaid services, but not getting treated: Lake Worth Manor failed to provide therapy services covered under Medicare/Medicaid, especially daily assisted exercises to prevent contractures. Lake Worth Manor neglected her medical needs by allowing exposure to paint fumes and various other chemicals when renovating the facility

5. People kept at the facility when they should have been transferred either to their home, or hospice: Flamingo Cluster was her home. S.F. should have been sent back as soon as she completed the IV antibiotics. Lake Worth Manor failed to send her back upon completion of this antibiotic cycle extending her stay by approximately 2-3 extra weeks

g. **E.L.:** A male in his late fifties while a resident at Defendant, Lake Worth Manor, now deceased, was fraudulently induced into re-entering Defendant, Lake Worth Manor, both as a private pay, and then through Medicare, by promising him that a specific CNA, Alcina LNU, would be assigned to him. The statement was false when made, made without the intention of assigning the CNA to him, related to a material fact, was made for the purpose of inducing **E.L.** into re-enter Defendant, Lake Worth Manor, it was reasonable for **E.L.** to rely upon it, and the false statement caused him harm. Notwithstanding many complaints to, and promises by the Director of Nursing, the Admissions Director, the Accounting Office and Social Services, **E.L.** was not assigned Alcina

LNU, and his physical and mental condition worsened.  His family would not have let him return to Defendant, Lake Worth Manor, but for the false promises regarding Alcina, nor allowed him to remain at Defendant, Lake Worth Manor, had they been informed that Alcina LNU would not have been assigned to him.  Further, the CNA's who were assigned to him often times left food  in his room, beyond his reach, which he was unable to have access to and thus failed to receive proper nutrition. The Dialysis center that he visited 3x per week made frequent attempts to intervene in his care and expressed concerns over his overall health to the facility and his family.  E.L. is a category 1,2,3 patient.

h.     **Mary Ann Krysko** *as personal representative for the estate of deceased brother* **Harry Krysko**:  Patient at LAKE WORTH MANOR, approximately 60 years old, deceased.  Diagnosed at birth mentally retarded, much of his life in different facilities receiving care for his condition. Grossly overweight, Dr. Foreman wrote orders to assist lose weight. LAKE WORTH MANOR  was not appropriate to serve a mentally retarded person because they did  not provide proper level of care. Verbally abused by nursing staff and DON, Isaac Millard, caused him much emotional difficulty; told by DON he was going home, "back to Windsor Court" where he had bad experiences at other facilities in the. He was allergic to Benadryl; but was given Benadryl, along with other medications to "calm him down."  Categories 1 and 2.

i.     *Sabrina Castro* on behalf of  her living father **Pedro Castro Sr.**, who  is a white male of Hispanic descent, who was thought to be approximately 65



years old.  Mr. Castro's date of birth is October 23, 1947 and he is

currently 62 years old, living at home with his daughter Sabrina Castro at

390 Tulip Tree Drive, Lake Worth, FL 33462.  His former occupation was

a truck driver and he speaks both English and Spanish.

1.    Mr. **Castro** arrived at Lake Worth Manor as a Medicare Part A or

Medicaid patient on February 4, 2009 from Jackson Memorial

Hospital in Miami, FL along with his son, Pedro **Castro** Sr. had

medical conditions that included acute respiratory failure, CVA,

DM, COPD, and a PEG feeding tube.  Several other conditions are

not known at this time.

2.    Mr. **Castro** is listed as a Category 1, 2, and 3.

3.    Category One People who developed another disease and kept

until they were so ill that a new hospitalization was required,

which then restarted Medicare/Medicaid payments:  Mr. **Castro's**

medical condition grew worse while he was a patient at Lake

Worth Manor, as evidenced by continuous falls resulting in new

hospitalizations, including a fall in August that required treatment

for a broken hip.  If Lake Worth Manor had released him at the

time of the family's original request, he may not have been subject

to additional injury.

4.    Category Two People that were kept at the facility, being funded

by Medicare/Medicaid services, but not getting treated:  Mr. Castro

did not receive adequate rehabilitative services while he was a

patient at Lake Worth Manor.  Mr. Castro's medical conditions

continued to deteriorate as a result of numerous falls. Mr. Castro's PEG tube became infected as a result of treatment at Lake Worth Manor.

5.     People kept at the facility when they should have been transferred either to their home, or hospice: Lake Worth Manor promised Mr. Castro that if he participated in speech therapy and was able to eat on his own, he could go home. Mr. Castro participated in speech therapy, began eating in restorative dining, and was able to eat on his own. Speech therapist Alma Medina noted this and spoke with the family and nursing staff to proceed to discharge. In June and July, the family of Mr. Castro made numerous requests to remove his feeding tube because he was able to eat on his own and they wanted to take him home. Requests were made by Maria, his sister, Pedro Castro Jr., and Sabrina Castro, his daughter.

6.     Lake Worth Manor delayed the removal of the feeding tube for weeks, citing that they were not able to schedule the service or the surgery could not be performed.

7.     In August of 2009, Mr. Castro fell and broke his hip, causing him to remain at Lake Worth Manor. He was finally released in late 2009 or early 2010 after spending approximately one year at Lake Worth Manor.

8.     Mr. Castro was a quiet man who kept to himself, spending most of his time in his room. He received frequent visits from his family.

k.    **Ana Comellas** *as personal representative for the estate of deceased husband* **Juan Comellas**. He was admitted to LAKE WORTH MANOR from a V.A. Hospital in Jacksonville, FL. Ana Comellas met with Lake Worth Manor staff prior to admission to discuss the special needs and treatment that he would require. At the meeting she was assured that all necessary precautions would be put into place and her husband would be well cared for. They failed to honor their promises at the care meeting, Juan Comellas never received physical therapy, he developed pneumonia there as patient and was only there for a number of weeks. He died at another hospital shortly after Lake Worth Manor transported him there. At Lake Worth Manor he developed severe bed sores, not present at time of entry into Lake Worth Manor. His wife requested to assist in his care but was not allowed; thus the severe bed sores which developed were not known to her until he was transported to the Hospital

l.    **Annette White** *as a personal representative on behalf of patient* **Kelvia Lewis.** Kelvia Lewis is a black male initially thought to be 65 years old, however his age was 67 years old, and date of birth is unknown. Mr. Lewis is deceased as of June 25, 2009. Mr. Lewis' address is unknown as he was living in his car upon admission to Lake Worth Manor. It is believed that Kelvia Lewis was not a citizen of the United States of America nor holder of an authorized work visa.

1.    Mr. Lewis arrived at Lake Worth Manor from JFK Medical Center after driving himself to the emergency room for treatment following a head injury requiring Skilled Nursing Facility (SNF)



care.  Lake Worth Manor administrator, Gilda Anderson, insisted
that Mr. Lewis, as a patient at Lake Worth Manor, go to JFK
Medical Center  to drive his car, a 2000's model silver Saturn,
back to Lake Worth Manor, instead of hiring a towing company to
deliver the car to Lake Worth Manor for only $50.  The Lake
Worth Manor bus driver (Janette-last name unknown), Activities
Director Michelle Toomey, and Mr. Lewis drove to JFK Medical
Center to get his car.  The car was waiting in a handicap spot
directly in front of the emergency room at JFK.  Dr. Stephen
Wyome stopped to say hello the bus driver and Ms. Toomey and
the patient were looking for the car.  Because is was not known
whether the car was safe to drive, Mr. Lewis had to drive the car,
alone, from JFK to Lake Worth Manor

2.     Mr. Lewis had other medical conditions that are not known at this
time.

3.     Mr. Lewis is listed as a Category 2.  People that were kept at the
facility, being funded by Medicare/Medicaid services, but not
getting treated:  Mr. Lewis entered Lake Worth Manor as a
Medicare Part A patient.  Upon treatment at Lake Worth Manor, he
was found to be in need of another surgery.  The exact nature of
this surgery is not known at this time.  The surgery was similar to
his prior hospitalization, thus the need to save "Medicare days."
Mr. Lewis agreed to have this surgery and Lake Worth Manor was

aware of his decision.  Mr. Lewis' surgery was scheduled in advance in July 2009.

Lake Worth Manor dismissed Mr. Lewis *to his car, where he had lived prior to becoming a patient* at Lake Worth Manor, in anticipation of surgery in June 2009.

4.   Lake Worth Manor failed to properly care for Mr. Lewis by dismissing him to his car.  This was an unsafe discharge

5.   Lake Worth Manor failed to properly treat Mr. Lewis by dismissing him before he was ready to be dismissed to a safe environment, in order that Lake Worth Manor could benefit by receiving higher payments, i.e. "preserve Medicare days" for future days.

6.   Mr. Lewis died because Lake Worth Manor wanted to preserve Medicare days.

m.   **Mildred Kelly, *legal guardian on behalf of patient* Nick Cernautain** is a former patient at Lake Worth Manor, living at another nursing home located in Palm Beach County Florida.  Nick Cernautain's medical diagnosis Parkinson's disease.  At Lake Worth Manor he did not receive therapy after numerous falls; significantly contributing to his decline.  There was nothing specialized in his rehab for his disease. No specialized measures were put into place for falling. Mildred Kelly visited Nick Cernautain on a daily basis; she requested numerous interventions, that were not followed.  Nick Cernautain is a Category 1 and 2 patient.



n.    **J. G.** is a white male approximately 47 years old  presently living  at

Boynton Beach Rehab  at 9600 Lawrence Road, Boynton Beach, FL

33436.

    1.    J.G. arrived at Lake Worth Manor February or March of 2009 as a

private pay patient from home.  Lake Worth Manor had to make

specific adjustments and order special equipment to accommodate

his care that included the rental of a large bed and a hover lift that

would accommodate his weight.  Upon his arrival he was sent

immediately back to the JFK hospital.  J.G. came back to Lake

Worth Manor and continued to remain in his bed, experienced skin

breakdown due the failure of Lake Worth Manor to order

necessary medical devices to accommodate his care.  and began to

receive therapy to the point where he was able to walk to the

bathroom unassisted.  J.G. family failed to pay the bill ($10,000-

$20,000) in July 2009 he was sent to JFK because he passed out on

the toilet and not accepted back at Lake Worth Manor.  In June

2009 he almost suffered serious injury in an accident caused by a

faulty hospital bed.  LPN Nurses, Jennifer Johnson and Christine

(LNU) were injured in an attempt to protect him from falling out of

the bed.

    2.    J.G. had medical conditions including Obesity.

    3.    J.G. is listed as a Category 3:  People kept at the facility when they

should have been transferred either to their home, or hospice.



Lake Worth Manor delayed the discharge stating that Dr. Foreman would not discharge him

o.   **S.R.:**  S.R. is a white male approximately 80 years old deceased, his date of birth is 9/10/1927, his date of death is 2/09/09.

1.   S.R. arrived at Lake Worth Manor as a Medicare or Medicare HMO Patient in mid 2008 for physical therapy.  His goals were to get therapy and go home to his condo in West Palm Beach, FL.  He remained at Lake Worth Manor until he was taken from Lake Worth Manor to JFK hospital on Sunday February 8, 2009 in the afternoon where he later passed away Monday February 9, 2009.

2.   S.R. had medical conditions including Diabetes & Pneumonia, Depression.

3.   S.R. is listed as a Category 1, & 2:  who developed another disease while not being properly cared for, and as a result of the improper care of his existing medical condition, by failing to monitor and control his blood sugar levels, he died when sent to the hospital.

4.   S.R.  was a WWII veteran and very proud of his service to his country.  However, he had a difficult family life.  He was widowed or divorced and had been up until the recent months prior to his death estranged from his children living in California.  The death of his son living in California in October of 2009 encouraged him to begin reestablish ties to his family.  S.R. often expressed a great deal of remorse and guilt for his failure to have a relationship with his two living daughters and had begun the process of

reestablishing ties to with his children in the months prior to his death.

5.      S.R. also had very close ties with a local church whose members and workers visited him regularly at Lake Worth Manor to assist him with affairs such as paying bills at his condo etc.

p.    **J.J.:**  is a black male of Haitian descent, approximately 40 years old, and believed to be living. It is believed that J.J. is not a citizen of the United States of America nor holder of an authorized work visa.

1.      J.J. arrived at Lake Worth Manor as a Medicaid-pending patient in late 2008 or early 2009 from South County Mental Health Center in Delray Beach, FL as a referral from caseworker Nick (LNU).

2.      His current address is not known, nor is it known if he is still a patient at Lake Worth Manor

3.      J.J. had medical conditions including HIV and needed dialysis three times per week.

4.      J.J. is listed as a Category 3:  J.J. was promised, upon admission, placement in an assisted living facility ALF.  His condition was stabilized.  J.J. made numerous requests for transfer to an ALF and stated that he "wanted to go to get a job."  Lake Worth Manor delayed placement into ALF to protect their daily census and continue receiving Medicaid payments for him.

q.    **R.B.:**  White male, D.O.B. March 07, 1946 -D.O.D. March 20, 2009. RB expired at Hospice of Palm Beach County, West Palm Beach at the age of 63 years old.  RB was born in Mt. Vernon, NY.  RB stated to various staff



members he went into early retirement from the NYPD as a result of medical disabilities. RB was an Army veteran.  RB is survived by his daughter K.B., and his Mother.  His Mother called frequently to speak with him, and his daughter visited him on a weekly basis.  R.B. was admitted to Lake Worth Manor.

1. R.B. is listed as a Category 1 and Category 2 patient.  People who developed another disease and kept until they were so ill that a new hospitalization was required, which then restarted Medicare/Medicaid payments.  Category Two People that were kept at the facility, being funded by Medicaid/Medicare services, but not getting treated

2. While a Medicare/Medicaid patient at LAKE WORTH MANOR, R.B. was a diabetic with End Stage Renal Disease. R.B. was dialyzed 3 times a week.  R.B. had an above the knee amputation.

3. RB was admitted in February/March 2009 to JFK Medical center, leaving LAKE WORTH MANOR with gangrene of the toe. RB had an amputation of multiple toes. He was allowed to become sick enough to require hospitalization and the staff failed to adequately provide daily care

4. R.B. was readmitted to LAKE WORTH MANOR in March 2009, where his condition declined and he became confused developed sepsis and died at JFK Hospice.

r. **K.C.**: is a white female, approximately 45 years old, living. K.C. is presently living at Lake Worth Manor, 1201 12th Ave South, Lake Worth,

FL 33462.  Her twin sister and responsible party is Barbara Ann Cherry, 3919 Caroline Drive #601, Lake Worth, FL  33461, home phone number is 561-585-3707. Barbara Cherry is an RN at a healthcare facility not affiliated with Lake Worth Manor and visited her sister daily, often providing food from outside restaurants.

1.   K.C. is alert and oriented times three, self-ambulatory, and requires little assistance ADL's and also often left overnight to go to Barbara's house on the weekends, especially on Sundays.

2.   K.C. arrived at Lake Worth Manor prior to August of 2008.

3.   K.C. had medical conditions including HIV and depression.

4.   K.C. is listed as a Category 3.  People kept at the facility when they should have been transferred either to their home, or hospice: CARES unit of Florida Department of Elder Affairs assesses patients in nursing homes to prevention of unnecessary or premature admission to a nursing home; provide a more effective coordination of an individual's medical, social and psychological needs and resulting level of care; and give referral assistance in obtaining in-home and community services to avoid nursing home care.  Olga LNU from the CARES unit demanded K.C.'s discharge on the basis that her level of care did not require skilled nursing services.  Lake Worth Manor delayed the discharge stating that Dr. Maric would not release her from Lake Worth Manor.

5.   K.C. is a very quiet lady with a pleasant disposition who attends activities such as resident parties, special events, and occasionally



resident council. She is both patient and tolerant of her peers, socializes with other residents in the smoking area as well as at events, and has attended many outside trips shopping or local events. While a patient at Lake Worth Manor, she has experienced abuse by other Lake Worth Manor patients, including an incident where Donna Mitchell went into her room and stole her CD player resulting in her sister having to go into Donna Mitchell's room to retrieve the stolen item because nursing staff would not provide assistance.

s.   **I.H.:**  is a white male thought to be approximately 95 years old, presently living, and widowed. His family currently resides out of state. Donald H. is his Power of Attorney, and resides in Monroe Township, NJ 08831. His other son is Richard H. who resides in Somerset, NJ 08831. Both sons rarely visit their father at Lake Worth Manor.

   1.   I.H. arrived at Lake Worth Manor as a Medicare patient on March 10, 2009. He was transferred from Lakeview Care Center in Delray Beach, another Millennium Management L.L.C Property.

   2.   I.H.'s medical conditions included difficulty walking, generalized muscle weakness, unspecified HTN, Alzheimer's Disease, senile dementia, glaucoma, head injury, insomnia, hyperlipidemia, closed fracture, pelvis and several other conditions not known at this time.

   3.   I.H. is listed as a Category 1, 2, and 3: People who developed another disease and kept until they were so ill that a new hospitalization was required, which then restarted



Medicare/Medicaid payments: I.H.'s medical condition grew worse while a patient at Lake Worth Manor as evidenced by continuous falls. In fact, he fell so many times that the facility provided him with a bicycle helmet to protect his head from the repeated trauma caused by the falls approximately two months after admission. Some of these falls required hospitalizations. I.H.'s medical condition deteriorated while he was a patient at Lake Worth Manor as evidenced by repeated hospitalizations three times during the first months of care at Lake Worth Manor.

4.  Category Two People that were kept at the facility, being funded by Medicare services, but not getting treated: I.H. did not receive adequate rehabilitative services while he was a patient at Lake Worth Manor. I.H. did not receive appropriate psychiatric treatment, often waiting a long time to receive services including a competency evaluation. The reason for the delay was the failure of Lake Worth Manor to hire a consulting psychiatric service then actually provided a psychiatrist instead of an ARNP to service a facility with over 80% of the population using psychoactive medication.

5.  Lake Worth Manor failed to protect I.H. from former private duty aid Raquel Dahl.

    i.  In an initial admission care plan conference held in March of 2009, I.H.'s family specifically requested to Lake Worth Manor interdisciplinary team that Raquel Dahl be



prohibited from visiting I.H. at Lake Worth Manor.  The family stated that there was an open investigation into the theft of some money and checks, which Raquel Dahl was believed to be a suspect of.  Against the family's wishes, Raquel Dahl continued to be allowed into Lake Worth Manor to visit I.H.  In May of 2009, Gilda Anderson placed her name and contact information on the I.H. resident face sheet as a person to contact to obtain medical information or in an emergency.  When notified of this error and being requested to delete Raquel Dahl's contact information from I.H.'s face sheet, Ms. Anderson refused and stated that she would not refuse to allow entry because it was a violation of I.H.'s resident rights.  This action put I.H. at risk as a vulnerable adult and demonstrated of Lake Worth Manor to protect its residents from harm.  I.H.'s family was never contacted or made aware of this situation

6.  Category 3 People kept at the facility when they should have been transferred either to their home, or hospice: Recommendations were made to place I.H. on hospice by staff but denied because he was a Medicare patient.  I.H.'s family also requested hospice services.

t.  **J.A..** is a white male who was  92 years old and he is deceased, passing away on  June 23, 2009. V R.is his daughter, she resides in Cape



Canaveral, FL 32920. J.A. arrived at Lake Worth Manor as a Medicare Part A patient in 2009.

1.     J.A. had medical conditions which included pneumonia which worsened while he was a patient at Lake Worth Manor, and several other conditions not known at this time.

2.     J.A. is listed as a Category 1, 2, and 3.

u.     **F.R.:** approximate age is 80 years old. It is uncertain whether he is living or deceased. F.R. was transported to Lake Worth Manor as a Medicare patient in November of 2008. Numerous hospitalizations regarding starting Medicare/Medicaid payments. Approximate length of stay at Lake Worth Manor: November of 2008 to present.

1.     Medical Conditions: Dementia, muscle weakness (severe weight loss)

2.     He was in Category (1)(2)&(3)

    i.     While at Lake Worth Manor, F.R. was kept so under-nourished that it resulted in large weight loss. This was only caught on a monthly weight check. LPN and daily CNA contact failed to notice that he was not eating and losing weight He lost approximately 20% of body weight. and was visibly unable to feed himself.

    ii.     The dietary tech, Erica Ruiez, and R.D., Gloria LNU, MDS, Crimpson Kimmick, restorative nurse Shamike Tate Stubbs, wound care nurse Janice Hill, finally noticed the



severe weight loss which had been going on for an extended period of time in a weekly dietary meeting

iii. Dietician technician and RD blamed weight loss on lack of communication by nursing staff. Weight loss resulted in a severe decline in condition

iv. In December or November of 2009, F.R. wandered out of the door located in front of the 1st floor (NSG station). This was located in the smoking area. The door had no automatic push for handicap entrance. F.R. slipped backwards down the ramp in his wheelchair resulting in the wheelchair falling backwards. F.R. hit his head on the concrete sidewalk. He was found by LPN Jennifer Johnson, MT, and other staff with his knees and feet in the back of the chair and head on the concrete. He suffered a subdural hematoma as a result of this fall. LAKE WORTH MANOR was aware of this ramp leading to the smoking area as seen in photographs. This ramp was especially a danger to patients in wheelchairs and staff due to the steepness of the incline. In October of 2008 patient SK (1) [patient z below] slipped on the ramp while attempting to assist another resident up the ramp back into the facility. SK broke his hip in that fall. The facility continued to ignore the dangers of the ramp, stating it was supervised by A Certified Nursing Assistant.

v.   **S.J..** is a white female of Romanian descent, a non-U.S. citizen who is approximately 70 years old and is currently living at the home of her daughter S. J.-S who is an RN.. S.J. is a patient of Lake Worth Manor Medical Director Dr. Stephen Wyome. Dr. Wyome referred Ms. J. to Lake Worth Manor. S. J-S. also works with Dr Wyome.

1.   S.J. arrived at Lake Worth Manor in early 2009. S.J has medical conditions that are unknown at this time.

2.   S.J. is listed as a Category 3. People kept at the facility when they should have been transferred either to their home, or hospice: S.J. was kept at Lake Worth Manor longer then she needed to be to use all of her Medicare Part A days instead of dismissing her to her home at the time when she no longer required skilled nursing care.

w.   **S.N.** is a white male who is approximately 85 years old, presently living, and his date of birth is unknown. S. N. is currently a resident at Morse Geriatric Center, 4847 Fred Gladstone Drive, West Palm Beach, FL 33417-8024, M.N. is his wife and her address is in Boynton Beach, FL.

1.   S.N. arrived at Lake Worth Manor as a Medicare Part A patient. He has various medical conditions that are not known at this time.

2.   S.N. is listed as a Category 2 patient People that were kept at the facility, being funded by Medicare/Medicaid services, but not getting treated: Mr. N entered Lake Worth Manor as a Medicare Part A patient. Upon treatment at Lake Worth Manor, he did not receive adequate therapy services.



3.      S.N. told his wife that he was having an affair with Lake Worth
Manor PTA Stacie Perkins.

4.      S.N. repeatedly requested to be released to an ALF.

5.      S.N. was overmedicated as a patient at Lake Worth Manor.  S.N.
did not receive the appropriate psychiatric treatment.  Lake Worth
Manor attempted to release him to an ALF Crest Manor but a
problem occurred and he was sent back to Lake Worth Manor.
Upon return to Lake Worth Manor, he refused to enter the facility.
S.N. physically assaulted LPN Jennifer Johnson by biting her
breast in an attempt to bring him into the facility. S.N. remained a
patient at Lake Worth Manor until he was Baker Acted.

x.      **M.D.**  is a white female  and she is currently 96 years old, presently living
at Lake Worth Manor.  Her son is J. D. and he resides in Lake Worth, FL
33462.  M.D. arrived at Lake Worth Manor on April 22, 2008.  Prior to
arrival at Lake Worth Manor, her son, J. D. provided much of her care at
home with the assistance of his friend.

1.      M.D. is a longtime resident of Lake Worth, FL, formerly an artist
and a graphic artist.  J. D. visited his mother everyday at Lake
Worth Manor, often providing her with music and other activities
to meet her needs.  Mr. D. also would accompany his mother on
outings to the beach, as she was a beach-lover in her younger days.

2.      M.D.'s medical conditions included contractures, CHF, atrial
fibrillation, PVD, lower leg amputation, hemiplegic, pneumonia,
and dementia with behavior disturbances.



3. M.D. is a Category 1 & 3 patient.

4. Category One.  People who developed another disease and kept until they were so ill that a new hospitalization was required, which then restarted Medicare/Medicaid payments:  M.D.'s medical condition grew worse while she was a patient at Lake Worth Manor, as evidenced by repeated hospitalizations. Following new hospitalizations M.D. developed new conditions including, Mersa and advanced stages of pneumonia

5. Category Three People kept at the facility when they should have been transferred either to their home, or hospice.  Lake Worth Manor staff recommended M.D. as a candidate for hospice, but her son would not permit the facility to do so, so she continued repeated hospitalizations and her overall condition grew worse.

y. **N.K.:**  is a white female, of Polish or Russian decent, whose date of birth is July 20, 1918.  She passed away on March 26, 2009.  She is survived by her daughter, Z. W. her son-in-law, S.W. of Palm Beach Gardens, FL, and her grandson J. W. of Middletown, NY.  N.K. was admitted to Lake Worth Manor on July 20, 2008 with a history of HTN, atrial fibrillation, and a pacemaker.  She was a patient at Lake Worth Manor until the time of her death on March 26, 2009.  During her time at Lake Worth Manor, she was alert and oriented times 2-3 with intermittent periods of confusion, self-ambulatory.

1.    Family visited N.K. monthly at Lake Worth Manor. Some of the concerns voiced by the family included missing/stolen jewelry and an operation to place a stint in her heart at her age.

2.    N.K. was active participant in activities program.  She would take great pride in telling those around her about her days of working in a factory.  She was verbal and often spoke English, Polish, or Russian, acknowledged when her name was called, and smiled often.

3.    N.K. is listed as a Category 1, 2 and 3.

4.    Category One People who developed another disease and were kept until they were so ill that a new hospitalization was required, which then restarted Medicare/Medicaid payments:  While a Medicaid patient at Lake Worth Manor, N.K. developed "purple feet" (edematous skin condition) possibly due to failure of Lake Worth Manor to provide weekly skin checks, provide follow-up cardiac consults per physician orders for pacemaker checks, as well as follow-up consults with cardiac specialists to monitor atrial fibrillation and overall cardiac health, and comply with original doctor-ordered daily application of support TED "hose" for bilateral edema.

5.    Lake Worth Manor argued upon recertification that the resident was noncompliant with the TED hose, thus they should be removed from resident plan of care.



6.     The order to discontinue the use of support TED hoses was received by Lake Worth Manor on November 15, 2008 as an attempt to pass recertification survey on November 13, 2008N.K. was taken to JFK Medical Center from Lake Worth Manor with "blue feet" in early 2009.

7.     Category Two People that were kept at the facility, being funded by Medicare/Medicaid services, but not getting treated:  Upon return  to Lake Worth Manor, N.K. returned to Lake Worth Manor as a Medicare Part A patient in February or March of 2009.  She was a different person following her hospitalization; bed-bound, unresponsive most of the time, and unable to express needs.  She was also no longer able to feed herself and required use of a PEG feeding tube.

8.     People kept at the facility when they should have been transferred either to their home, or hospice:  Upon readmission to Lake Worth Manor in February or March of 2009, the staff suggested that N.K. be placed in hospice care.  The family of N.K. was also notified and agreed with hospice care, despite the initial shock about her overall condition.

9.     LNHA Michael DeSalvo stated to staff upon initial request for hospice intervention, "Why are you putting her on hospice?  She is a Medicare patient.  I don't care what the family wants."  Staff was instructed to continue to provide physical and occupational therapy for N.K. while she was bed-bound, to generate Medicare revenue.



10.    In the immediate days on or about March 24, 2009, prior to her death, N.K. was finally placed on hospice care.

z.    Patient **S.K (#1)** a man approximately 50 years old, was sent to LAKE WORTH MANOR prior to August, 2008. S.K (1), is believed to be presently living at LAKE WORTH MANOR the address is 1201 12th Ave South, Lake Worth, FL 33462. S.K (1), is alert & oriented X 3, self ambulatory, requires little assistance ADL's. S.K (1), is a very quiet man with a pleasant disposition who attends activities such as resident parties, special events, and occasionally resident council. He is both patient and tolerant of his peer, socializes with other residents in the smoking area as well as at events and has attended many outside trips shopping or local events. There was no medical purpose for keeping him at Lake Worth Manor. S.K (1), is listed as a Category 1

1.    Category 1 <u>People who developed another disease and kept until they `were so ill and/or experienced traumatic events  to necessitate a new hospitalization was required, which then restarted changed the patient status/payor source from Medicare or Medicaid ps</u>.  While a presumed to be a Medicare or Medicaid pending  patient at LAKE WORTH MANOR, S.K (2),  broke his hip in attempt to assist another resident on an unsafe ramp.

aa.    **E.E.** a white female thought to be originally 78 years old, when she was admitted approximately Oct 2007. It was then documented that her DOB 11-14-1922. E.E. DOD 10-22-09. E.E.arrived at Lake Worth Manor as a Medicare part "A" in approximately October, 2007.  E.E. when she

arrived was self ambulatory with a Walker.  She had used all her Medicare

Part "A" days and then was converted to Medicaid.  E.E.'s medical

conditions included multiple fractures at Lake Worth Manor, that were not

detected until weeks after they had happened, and frequent Urinary Tract

Infections at Lake Worth Manor eventually she was determined to be a fall

risk a placed into a wheel chair.

1.    E.E. is listed as a Category 1.  2, and 3:  Staff at Lake Worth

Manor recommended that Ms. E.E. be transferred to Hospice, but

the Administration did not agree so long as they could collect

Medicare payments.

bb.    Patient **A.G.**. is a black female approximately 35 years of age believed to

be living  but.  She preferred to use the last name Regan as she frequently

states that she is a relative of the former United President Ronald Regan.

1.    A.G. was sent to Lake Worth Manor with Medicare Part A from

Oakwood Psychiatric Hospital to receive physical therapy and

occupational therapy.  She was in residence at Lake Worth Manor

from approximately April/ May 2009 to September/ October 2009.

In October, 2009 she was arrested on an outstanding warrant for

failing to appear in court.  A.G.'s arrest record also contains

charges of trespassing, drug possession, loitering and other crimes.

A.G. was involuntary placed in a mental health facility in 2007.

2.    A.G.'s medical conditions include HIV, psychosis, difficulty

walking, and other mental health issues.

3.    A.G. is a Category 2 and 4.



4.   Category 4. People who should not have been accepted or allowed to reside in Medicaid/ Medicare funded facility, because of their overall diagnosis, behavior, or symptoms required a higher level of care, presenting risk to the patient, other patients, staff, and visitors. A.G. is a patient that should never have been sent or allowed to remain a patient at Lake Worth Manor for the following reasons:

   i.   Her age;

   ii.   Numerous past arrests for felony drug possession and trespassing. There were warrants in her name during the time she was a patient at Lake Worth Manor;

   iii.   She was mentally unstable. She would threaten other patients and staff that she would cut herself open and pour blood over everyone to give them HIV. She threatened to bite other patients and staff. She would assault other patients and staff with her cane. She would also become violent if the staff did not provide her with cigarettes. She refused to comply with facility policies by smoking in her room and putting the facility at risk.

5.   Category 2. People that were kept at the facility, being funding by Medicare/ Medicare services, but not getting treated

   i.   Lake Worth Manor failed to provide an appropriate level of care required for a psychiatric patient. They did not properly monitor her behavior or psychiatric treatment.

cc.   Patient **S.K (#2).** is a male approximately 50 years old.  He is believed to

still be living and a current resident at Lake Worth Manor.  He was

homeless prior to admission to Lake Worth Manor.

1.   S.K. was admitted to Lake Worth Manor as a Medicaid pending

patient for physical therapy from an injury suffered as the result of

a car accident.  Prior to admission, S.K.(2) had been Baker Acted

for assaulting a nurse attempting to provide care for his injury. It is

believed that active arrest warrants exist in his name for failing to

appear on a trespassing charge.

2.   In the first few months at Lake Worth Manor Medicaid Specialist

defendant Ken Houston was observed falsifying paperwork and

misrepresenting his authority in an attempt to qualify S.K.(2) for

Medicaid.

3.   S.K(2). is a category 3 and 4.

4.   Category 3. People that were kept at the facility receiving

Medicaid/ Medicare benefits instead of being transferred to their

home or hospice care because upon  healing he should have been

released from a skilled nursing facility to an ALF

5.   Category 4. People who should not have been accepted or allowed

to reside in  Medicaid/ Medicare funded facility, because of their

overall diagnosis, behavior, or symptoms required a higher level of

care , presenting risk to the patient, other patients, staff, and

visitors.   Residents and staff members have reported that S.K.(2)

has been physically and verbally abusive toward them.  Some of

these people include plaintiff Doreen Seaman and Sophie Kostidis. Multiple instances in which a resident exhibits abusive tendencies may constitute a danger to residents, staff, and visitors.

dd.   Patient **L.H**. is a Hispanic male, approximately 73 years old who speaks very little English. He is believed to still be alive. and currently residing in Palm Beach County, Florida

1.   L.H. arrived at Lake Worth Manor from St. Mary's Medical Center 03/23/09. He was a patient at another nursing home when he was Baker Acted for removing a sink from a wall (Lake Worth Manor maintenance director Joe Marino warned of his behavior upon admission) and taken to St. Mary's Medical Center. He was originally admitted Medicaid pending patient but soon improperly transferred to Medicare by use of a therapy "code" believed to be "97110". Although he spoke little English, he received therapy in English. L.H. is blind in one eye. This was not noted on his admission sheet. L.H. has various other medical issues including; Dementia, Alzheimer's, Psychosis difficulty walking, muscle weakness, Depressive Disorder, and Esophageal Reflux.

2.   While a Medicare patient, L.H. left Lake Worth Manor in June 2009 for a 2 week vacation to Cuba with his family. He was re-admitted 06/20/2009, which was a Saturday as a Medicare patient. This created major issues with the other residents (inconvenience, violation of rights, etc.).His family requested a review of his medication stating that he did not receive any while in Cuba.



Thus, questioning the need for his medications at Lake Worth
Manor.

3.    L.H. was listed as a Category 2 and 4.

4.    Category 2. People that were kept at the facility, being funding by
Medicare/ Medicare services, but not getting treated.   Lake Worth
Manor failed to provide necessary care in monitoring
overmedication.  Although L.H. could walk he was often seen in a
fully reclined gerichair sleeping during most of the daytime hours.
After the first month of being a patient at Lake Worth Manor L.H.
lost a significant amount of weight due to staff neglect to feed him.
The overall dx of dementia in advanced stage prevented him from
benefiting from any type of intensive physical or occupational
therapy.

5.    Category 4,  People who should not have been accepted or allowed
to reside in  Medicaid/ Medicare funded facility, because of their
overall diagnosis, behavior, or symptoms required a higher level of
care , presenting risk to the patient, other patients, staff, and
visitors.  Lake Worth Manor Staff unable to meet his needs due to
the fact that he spoke very little English and exhibited destructive
behavior.  L.H would have violent fits and destroy fixtures in 237
P.  237P was a private room in which L.H. resided.  He was
considered to be too violent to have a roommate and required a
private room that he subsequently began to destroy.  L.H. was not a
manageable patient at Lake Worth Manor.  He required a higher

level of care for the safety of himself and those around him. L.H. advanced dementia made him vulnerable to other residents that would mistake him accidently sitting in the wrong wheelchair as a threat causing a violent fight as well as a danger to other residents and staff.

ee. Patient **C.A.** is a Black male in his early 40s. C.A. was murdered in 2009.

1. C.A. was admitted to Lake Worth Manor to receive physical therapy following a gunshot wound received while witnessing a crime. When he arrived at Lake Worth Manor in 2009 he was afraid to leave his room or open the room blinds.

2. Police visited Lake Worth Manor and explained the situation to management and requested staff notifies them if C.A. left the facility.

3. C.A.'s mother, M.S. visited him while he was a patient at Lake Worth Manor. She was angered by the failure of the facility to protect his identity. This prompted Lake Worth Manor to place him under an alias "C.S."

4. As C.A. began to heal, he decided that he would like to move to an assisted living facility. C.A.'s transfer to an assisted living facility was approved by a person whose identity is unknown.

5. The assisted living facility that C.A. was transferred to was located less than 5 miles from the location where he had been shot while witnessing a crime.



6.   Within a few days of being transferred to the assisted living facility C.A. was found dead from new gunshot wounds.

7.   C.A. was a category 2 and 4.

8.   Category 2. People that were kept at the facility, being funded by Medicaid/Medicare services, but not getting treated.  Upon entrance to the facility it is known that police investigating the first shooting of C.A. requested notice prior to his discharge.  This request was made to the Admission's Director Rejetta Miller and the Marketing Director Hannah de La Pena.  The police never received notice from Lake Worth Manor of discharge.

9.   Category 4. People who should not have been accepted or allowed to reside in  Medicaid/ Medicare funded facility, because of their overall diagnosis, behavior, or symptoms required a higher level of care , presenting risk to the patient, other patients, staff, and visitors.  As a witness to a violent crime he should have been placed in a secure facility, or given an alias at the time of admission to Lake Worth Manor.  The failure of Lake Worth Manor Marketing Director Hannah de La Pena and Admission's Director Rejetta Miller to recognize the potential danger to staff, residents, and visitors could placed all of the other patients at the facility at risk.

ff.   Patient **J.C.** is female between the ages of 80-85.  J.C.  is believed to still be living, she is a former resident of Lake Worth Manor living at another nursing home located in the state of Florida J.C.'s medical conditions



include Dementia, frequent UTIs, and falls. J.C.'s daughter and husband (deceased) visited frequently and were involved in her care.

1.     J.C. is a Category 2.  People that were kept at the facility, being funded by Medicaid/ Medicare services, but not getting treated.

2.     Lake Worth Manor failed to protect her from harm by neglecting to obtain a declaration of mental incapacity. Worth Manor failed to provide a resolution or an investigation to family complaints of abuse by other residents

gg.     Patient **G.L.** is believed to be under an assumed alias at Lake Worth Manor for reasons unknown at this time. He is male of between the ages of 60 and 70. G.L's mother is believed to have been a patient at defendant "Lake View Care Center" at the time of his admission to Lake Worth Manor.  G.L. died in February of 2010 at Hospice St. Mary's.

1.     G.L. is a Category 4. People who should not have been accepted or allowed to reside in  Medicaid/ Medicare funded facility, because of their overall diagnosis, behavior, or symptoms required a higher level of care , presenting risk to the patient, other patients, staff, and visitors.. G.L. was violent towards staff, visitors, and other patients by physically assaulting, sexually harassing and verbally abusing such people.

hh.     Patient **F.A.** is a Hispanic male believed to be 60 to 70 years old.

1.     F.A. is a Category 2.  Category 2 people that were kept at the facility, being funded by Medicaid/ Medicare services, but not getting treated.  Lake Worth Manor failed to protect him from the



physical and sexual advances of other patients despite a declaration made of mental incapacitation made by Dr. Jonathan Greenfield.

ii.    Patient **D.B.** is a white female between the ages 60 and 70.  She was a patient at Lake Worth Manor on multiple occasions in 2008 and 2009.

1.    D.B. is a Category 4. People who should not have been accepted or allowed to reside in  Medicaid/ Medicare funded facility, because of their overall diagnosis, behavior, or symptoms required a higher level of care , presenting a risk to the patient, other patients, staff, and visitors.

2.    While a patient at Lake Worth Manor, D.B. was observed receiving a delivery of prescription medication over the fence surrounding the courtyard by a family member.  Staff members reported that D.B. was providing the medication to other patients. Lake Worth Manor failed to conduct an investigation or contact police immediately. Another patient, J.V., was sent to the hospital after being found unresponsive and believed to have suffered from an overdose on medication.  Upon this discovery, Lake Worth Manor administration ordered the search of D.B.'s room.  They found a significant storage of prescription medication.  The police and DEA were contacted.  D.B. placed the health and safety of the other patients at risk by dispensing or "selling" medications.

jj.    Patient **D.M**. is a female between the ages of 60-70, believed to be living in a nursing home in the state of Florida.  D.M was a patient at Lake Worth Manor for approximately 2 years.

1.      D.M. was a Category 4. People who should not have been accepted or allowed to reside in Medicaid/ Medicare funded facility, because of their overall diagnosis, behavior, or symptoms required a higher level of care , presenting a risk to the patient, other patients, staff, and visitors. D.M. was violent towards other residents, staff, and visitors. She showed violence by hitting, kicking, and slapping people and she would deliberately run over other people's feet with her wheelchair if she was angry.

kk.    **Willie M. Baldwin** was a patient at Lake Worth Manor. Deborah Battle is a personal representative for the estate of Willie M. Baldwin. Willie M. Baldwin was a category (1) and (2) patient.

ll.    **Thomasina Shirley Miller**, was a patient at a nursing home in West Palm Beach, FL that is believed to have been owned or operated by the defendants. Cheryl Davis-Darrell is the personal representative for the estate of her deceased mother Thomasina Shirley Miller. Thomasina Shirley Miller was a category (1), (2) patient.

mm.    **Pedro Castro Jr** was a patient at Lake Worth Manor. He is a resident of Lake Worth, Florida. He arrived by transport from a hospital in Miami at the same time as his father, Pedro Castro Sr. He had the same social security number as his father. He stayed at Lake Worth Manor for approximately one week. He was a category (2) and (3) patient who told staff at Lake Worth Manor that he was not supposed to be in nursing homes and should be sent home.

nn.    Patient **J.M.** is male believed to be living and a current patient at Lake Worth Manor between the ages of 60-75 years old. J.M. is alert, self ambulatory and cognizant of his daily environment. He visits the local convenience store daily signing himself out and returning back to Lake Worth Manor with various products that he purchased during his travels. J.M. is a Category 3. People that were kept at the facility receiving Medicaid/ Medicare benefits instead of being transferred to their home or hospice care because upon healing he should have been released from a skilled nursing facility to an ALF. J.M. also complained of his roommate smoking in the room that was shared, overall condition of the facility, abuse suffered by other patients and concern for other patients.

oo.    **M.A.C.** is a female believed to be living Patient J.M. is male believed to be living and a current patient at Lake Worth Manor between the ages of 40-50 years old. M.A.C. is alert, self ambulatory and cognizant of her daily environment. M.A.C. has medical conditions that include a post Tramatic Brain Injury, CVA, Expressive Aphasia, and an active Bulimia Nervosa and other psychotic conditions that are not known at this time. M.A.C is believed to be her own responsible party dispite her inability to communicate and Palm Beach County Legal Aid was working to obtain legal guardianship. M.A.C. is a Category 4. People who should not have been accepted or allowed to reside in Medicaid/ Medicare funded facility, because of their overall diagnosis, behavior, or symptoms required a higher level of care , presenting a risk to the patient, other patients, staff, and visitors. M.A.C.. had an active eating disorder and was observed

throwing up her food by residents, staff and visitors, Lake Worth Manor was not a facility treated the psychiatric condition, provided necessary therapy or actively monitored the condition. Staff provided recommendations that were not followed and developed plans of care that were false and never intended to be

pp.     Patient **H.D**. is a white male believed to be living, between the ages of 65-85, a former patient at Lake Worth Manor. H.D. is a Category 2 patient. People that were kept at the facility, being funded by Medicaid/ Medicare services, but not getting treated. Lake Worth Manor failed to provide physical therapy that was billed during his stay, and respond to complaints made by both H.D. and his wife M.D. that he was "overmedicated".

qq.     Patient **L.R.** is a white female believed to be living, between the ages of 65-85, a current patient at Lake Worth Manor. L.R.. is a category 1 & 2 patient. Category 1 People who developed another disease and kept until they `were so ill and/or experienced traumatic events to necessitate a new hospitalization was required, which then restarted changed the patient status/payor source from Medicare or Medicaid. L.R. developed conditions that required hospitalizations that included an infection in her PEG feeding tube. L.R. spoke very little English and the communication barrier is believed to have been a problem while receiving treatment at Lake Worth Manor because the staff assigned to care for her did not speak Spanish. L.R. is also a Category 2 people that were kept at the facility, being funded by Medicaid/ Medicare services, but not getting treated. Lake Worth Manor failed to provide physical therapy that was billed

during her stay, and respond to complaints made by both L.R. and family members.

4.30    Upon information and belief, there are numerous others who are/were within Categories (1),(2),(3) and (4).

4.31    **Numerous residents,** *including but not limited to* **Gloria Kurzman; A.G., P.B.; K.A.M.; A.A.G.; S.K.; C.S.; J.G.; J.S.; A.S.; M.B.W.; L.E.; I.H.;** received bills directly from providers (and, in many instances from debt collectors) to pay for services which should have been paid for by Defendant, Lake Worth Manor.

## V.

## FIRST CAUSE OF ACTION: FALSE CLAIM ACT

**Relators re-allege paragraphs 1.1-1.15; 2.1; 3.1-3.180; 4.01- 4.31, and allege further:**

5.1    Defendants made numerous false claims for reimbursement for Medicare and/or Medicaid Patients.  Said patients did not receive the necessary medical care guaranteed them by the **Omnibus Budget Reconciliation Act of 1987/ Federal Nursing Home Reform Act,** 42 U.S.C. §§ 1396r, 1396a(w) as incorporated by 42 U.S.C. § 1396r;

5.2    Defendants participated in various frauds calculated to deny patients necessary services, bill patients for services never received, re-setting of Medicare and Medicaid rates through manipulation of reimbursement rates, by changing "ownership" in various Nursing Home Facilities unlawfully and through deceit, submitting fraudulent bills for medications and services never provided and/or performed, and performing services which were not medically necessary, and through kick-backs to Physicians, Managing Organizations, Product and Service providers, billing for administrative and other, non-reimbursable.

5.3     Defendants knowingly presented and/or caused to be presented to the United States, false claims or statements in support of the false claims which were submitted to the United States for payment or approval;

5.4     As a result of the defendant's false claims, the government reimbursed defendant for the services that were allegedly performed, but which were never performed; and for services which were provided, but were not medically necessary and which were provided by individuals not licensed or qualified for the services provided

5.5     The Relators, and the members of the putative class action were harmed by Defendants' fraudulent activities;

5.6     The United States Government, and through the United States Government, both federal and state taxpayers were harmed by the fraudulent acts of Defendants.

5.7     Relators and putative class action members (patient victims) have direct and independent knowledge of the facts underlying the complaint, and the facts and allegations underlying this complaint have not been publicly disclosed as defined under the False Claims Act. 31 U.S.C.A. § 3730(e).

## VI.

## SEVERABILITY

6.1     In the event that any section should fail, be dismissed or otherwise removed from the litigation, the remaining causes of action, Defendants and all other elements will continue unaffected in full force pursuant to the Severability Clause found in 15 U.S.C. § 57.

## VII.

## JURY DEMAND

7.1     Plaintiff prays for trial by jury.



**WHEREFORE**, Relators and putative class action Plaintiffs pray that this Court enter judgment three times the amount actually proven at trial, on behalf of the Relators/The Government of the United States of America and/or the class action Plaintiffs and against the Defendants  plus prejudgment interest together with reasonable attorney's fees and for such other and further relief as the Court deems equitable and just.

Dated this 22 day of November, 2010

Respectfully submitted,

_____
Marc G. Kurzman
Florida Bar Number: 0300624
Kurzman Grant Law Office Chartered
Royal Palm Towers
1600 South Dixie Hwy, Ste. 300-C
Telephone: 1-800-681-1LAW
Fax: 612 617 9009
Email: MarcKurzman@KurzmanGrant.com
Attorney for Relators/Plaintiff(s)

_____
Dara S. Siegel
Florida Bar Number: 0160202
Siegel,Siegel&Wright
Royal Palm Towers
1600 South Dixie Hwy, Ste. 300
Telephone: 561-620-8200
Fax: 561 620-8225
Email: DSiegel@TeamSiegel.com
Attorney for Relators/Plaintiff(s)